IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEBRA SUSAN GARCIA,

       Plaintiff,

v.                                                                              CV 12-1195 WPL

CAROLYN W. COLVIN, *Acting Commissioner*
*of the Social Security Administration*,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Debra Susan Garcia filed applications for Disability Insurance Benefits and Supplemental Security Income on February 17, 2009. (Administrative Record ("AR") 12.) She alleges disability beginning on July 7, 2008, due to depression, anemia, fatigue, hepatitis C, fibroid tumors, plantar fasciitis, and obesity. (AR 31, 138.) Garcia's claim was initially denied on May 27, 2009, and again on May 13, 2010, following reconsideration. (AR 12.) Administrative Law Judge ("ALJ") Barry O'Melinn held a disability hearing on October 12, 2011. (AR 27-65.) On October 27, 2011, he determined that Garcia was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 12-21.) Garcia filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-3.)

Garcia sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Remand to Agency (Doc. 22). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to have me serve as the presiding judge and enter a final

judgment. Having carefully considered the pleadings, facts, and relevant law, I deny Garcia's motion to remand.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the ALJ. *See id.* The ALJ's "failure to apply the correct legal standards, or to show us that she has done so, [is] also grounds for reversal." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. When the claimant's exertional level, age, education, and skill level perfectly match the criteria in the Listing of Impairments, the ALJ may base a determination of nondisability conclusively on the grids at step three. *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). If a claimant's impairments are not

equal to the those in the Listing of Impairments, then, before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

### FACTUAL BACKGROUND

Garcia, a fifty-year-old woman with some college education, worked as a hair stylist before leaving the work force to serve as a paid caregiver to her mother until 2002. (AR 32, 139, 143.) After her mother passed away, Garcia lived with her father and cared for him without compensation. (AR 33.)

Garcia receives medical care from the University of New Mexico ("UNM") Health Sciences Center. The doctors at UNM have treated Garcia for a number of medical issues throughout the years, including pelvic pain and uterine bleeding caused by fibroids, depression, hepatitis C, hypertension, and foot pain. Garcia's history regarding her pelvic issues is perhaps the most extensive. From March 2008 to July 2008, Garcia attended monthly exams for her

chronic pelvic pain and heavy uterine bleeding. (AR 239-40, 244-45, 247-53.) Garcia declined to have surgical intervention for her pain, as she believed that a combination of medication and a walking routine had alleviated her symptoms. (AR 239.)

On February 9, 2009, Garcia returned to the UNM clinic because her heavy bleeding returned. (AR 224.) Garcia was counseled regarding a hysterectomy, endometrial ablation, or the use of an interuterine device ("IUD"), but she did not schedule any procedures at that time. (AR 225.) At a general healthcare maintenance exam later that August, Garcia reported that she had not experienced any significant problems in the past year. (AR 317.)

Garcia was seen again for pelvic pain and heavy bleeding in October 2009 (AR 310-11), December 2009 (AR 399-400), and May 2010 (AR 392-94), and she underwent a pelvic ultrasound in June 2010 (AR 430). She was diagnosed with uterine fibroids and was again counseled regarding an IUD. (AR 388.) Garcia decided to have an IUD implanted, and the first attempt to insert the IUD was done in the doctor's office on June 29, 2011. (AR 384.) This attempt failed (*id.*), as did the second attempt (AR 381-83). On September 2, 2010, Garcia's doctor successfully placed the IUD after performing the procedure in an operating room while Garcia was under general anesthesia. (AR 401-02.) Several weeks after the procedure, Garcia reported some discomfort, bleeding, and cramping (AR 373-74), but by October 2010, she reported to her doctor that she was doing well (AR 371).

On February 24, 2011, Garcia went to the doctor following seven days of heavy bleeding and cramping. (AR 363-64.) An ultrasound and x-ray revealed that the IUD had come out. (AR 422, 428.) Despite the fact that the IUD had come out, Garcia reported to her doctor on March 11, 2011, that the bleeding and cramping had "completely resolved." (AR 361.) Garcia had five more doctor visits in May, June, July, and August 2011, but she made no complaints regarding

pelvic pain or bleeding. (AR 349-59, 404-05.) On September 13, 2011, Garcia returned to UNM for a follow-up visit for her foot pain, and at the appointment, she mentioned that her bleeding had worsened, but she was doing better. (AR 437.) She stated she was not interested in a hysterectomy. (*Id.*) The doctor prescribed her oxycodone to manage her pain during menstruation, which both Garcia and the doctor noted was an effective way to treat her condition. (AR 437-38.)

Garcia also suffers from right foot pain. On December 31, 2008, Garcia presented with left foot pain, stating that it hurt to walk. (AR 229.) Despite telling the nurse that she had left foot pain, she showed the doctor her right foot and walked with a mild limp favoring the right side. (*Id.*) An x-ray was taken two days after the visit that revealed a tiny corticated spur on her right heel. (AR 255.) Garcia was diagnosed with synovitis and instructed to use hard-soled shoes, cold compresses, and Tylenol. (AR 227-28.)

Garcia did not seek treatment for her foot again until May 10, 2011. (AR 357-58.) She was diagnosed with plantar fasciitis, and the doctor instructed her to stretch, exercise, use shoe supports, and apply topical medications. (AR 358.) Garcia returned to the doctor a month later for persisting pain despite conservative treatment (AR 355), and she received injections on June 29, 2011 (AR 353). In a follow-up appointment on August 3, 2011, she reported that the injections helped significantly, but she decided to keep the appointments she had scheduled for additional injections. (AR 349.) In September, Garcia told her doctor that she would like another injection, and the doctor referred her to physical therapy as well. (AR 438.) The record does not contain further treatment notes for Garcia's foot pain.

From 2009 to 2011, Garcia sought treatment for her depression at the UNM Psychiatric Center. Initially, Garcia took multiple medications for her depression, but by April 2010, she was

only taking Wellbutrin. (AR 322-24, 414-14, 419-20.) In June 2010, Garcia asked her healthcare provider, Mary Yutzy, CFNP, to sign a disability form, but Nurse Yutzy refused, since it was her opinion that Garcia could work. (AR 412-13.) Garcia continued to see Nurse Yutzy throughout 2010 and 2011, and she regularly reported that she was doing "well" on the Wellbutrin, and her Global Assessment of Functioning ("GAF") scores were regularly in the range of 48 to 55. (AR 368, 404-13.)[1]

Garcia also has hepatitis C and hypertension. Doctors regularly monitored Garcia's hepatitis C and counseled her on treatment in 2008 (AR 234-36, 244-45, 247-48), but the issue was not raised again until 2011, when Garcia stated that she did not wish to have treatment (AR 361, 437). Her blood pressure has been under control since June 2010 with medication. (AR 361, 368, 370-72, 388.)

### HEARING TESTIMONY

The ALJ held a hearing on October 12, 2011, at which Garcia and Vocational Expert ("VE") Pamela Ann Bowman testified. (AR 26.) John Bishop served as Garcia's non-attorney representative at the hearing. (AR 13.) Garcia testified that she completed high school, attended some college, and was in the process of re-enrolling in school to get her beautician's license. (AR 34-36.) She then discussed her impairments and how they prevent her from working. She explained that due to heavy bleeding she needs frequent trips to the restroom and becomes weak so she cannot stand for too long. (AR 37, 48.) She also claimed that her right heel causes her so much pain that she is unable to walk on it, despite the use of cortisone shots. (AR 37-38.)

---

[1] A GAF score is a rating that reflects the individual's overall level of psychological, social and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000). A GAF score of forty-one to fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning, and a score of fifty-one to sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 34.

Depression also impaired her ability to function, and Garcia stated that she sleeps most of the day as a result of her moods. (AR 38-39.) When asked about her hepatitis C, Garcia stated that she has not sought treatment for her condition because her doctors told her that the medications for hepatitis would increase her depression threefold. (AR 42.) However, the ALJ expressed doubt about this statement since it was not contained in any of the treatment notes. (AR 42-43.)

The ALJ then questioned Garcia about her drug use, noting that the medical records indicate that she uses marijuana daily, although there is no indication in her UNM medical records that she holds a prescription for medicinal marijuana. (AR 43.) Garcia vehemently denied drug use and stated she had quit smoking marijuana in 2007. (AR 44.)

Next, the ALJ questioned the VE. The ALJ asked the VE to assume a person with Garcia's age, education, and work history who is able to perform work at the sedentary exertional level and whose work would be limited to understanding, remembering, and completing simple, one- to two-step tasks. (AR 50.) The ALJ asked if such a person could perform work, and the VE responded that the following jobs were available: mail sorter, with a reasoning level of two; account clerk, with a reasoning level of two; and jewelry sorter, with a reasoning level of two. (AR 50.)

## THE ALJ DECISION

The ALJ reviewed Garcia's applications for benefits according to the sequential evaluation process. At the first step, the ALJ found that Garcia had not engaged in substantial gainful activity since her alleged onset date of February 17, 2009. (AR 14.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of depression, obesity, and plantar fasciitis of her right foot. (*Id.*) The ALJ expressly considered whether Garcia's uterine fibroids and metromenorrhagia, which cause Garcia's pelvic pain and bleeding, constituted

severe impairments, but he determined that they were non-severe because they had been resolved with treatment. (AR 15.) At step three, the ALJ found that Garcia's combination of severe impairments did not equal one of the listed impairments. (AR 15-16.) The ALJ then reviewed the medical evidence and determined that Garcia had the RFC to perform work at the sedentary level, but that due to her mental impairments she was limited to understanding and remembering one- to two-step instructions. (AR 16.)

At step four, the ALJ concluded that Garcia did not have past relevant work. (AR 20.) He considered Garcia's age, education, work experience, and RFC and concluded that, based on the testimony of the VE, Garcia could perform the work of a mail sorter, charge account clerk, or jewelry sorter. (AR 20-21.) Accordingly, the ALJ concluded that Garcia was not disabled as defined by the SSA and not eligible for benefits. (AR 21.)

## DISCUSSION

Garcia moves to remand on the grounds that the ALJ erred in finding that her pelvic issues were non-severe, ignoring the impact of her obesity on her RFC, and failing to resolve the inconsistency between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). (Doc. 22 at 6, 7, 9.) The Commissioner opposes the motion, arguing that the ALJ did not make any errors, and to the extent that he did, they were harmless. (Doc. 23.) I agree with the Commissioner, and I find that the ALJ's decision was procedurally correct and supported by substantial evidence.

## I.     Uterine Bleeding at Step Two and the RFC

At step two, the ALJ must determine whether the claimant's alleged ailments constitute severe or non-severe impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The Tenth Circuit recently held that "the failure to find a particular impairment severe at step two is

not reversible error as long as the ALJ finds that at least one other impairment is severe." *Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009) (unpublished) (citing *Oldham v. Astrue,* 509 F.3d 1254, 1256 (10th Cir. 2007)).

Garcia argues that the ALJ's failure to find that her uterine bleeding constituted a severe impairment at step two is reversible error. (Doc. 22 at 6.) She asserts that the ALJ should have found the impairment to be severe and considered the effect of her uterine bleeding on her RFC. However, the ALJ found that Garcia suffered from the severe impairments of depression, obesity, and plantar fasciitis at step two (AR 14), prompting him to proceed with the sequential evaluation process. Accordingly, I need not consider whether the ALJ's decision to label Garcia's pelvic pain and bleeding as non-severe was erroneous since any error would be harmless.

Even though Garcia's uterine bleeding was non-severe, the ALJ was required to consider the impact of her impairment on her RFC, *see* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2), which he did (AR 17). Garcia does not argue that the ALJ's discussion of her uterine bleeding was not supported by substantial evidence, nor does she claim that he erroneously failed to consider medical evidence; rather, her argument amounts to a conclusory assertion that he *should* have considered the impact of her uterine bleeding on her RFC. Since the ALJ did precisely this, and since Garcia has presented no argument as to why his ultimate conclusions are incorrect, I hold that this is not a valid basis for remand.

## II.     Obesity & Duty to Investigate

Garcia next challenges the ALJ's discussion of her severe impairment of obesity at steps three and four. (Doc. 22 at 7-8.) She begins by stating that the ALJ concluded with no analysis that her obesity did not meet the listing requirements for a disability at step three. Yet, Garcia

9

does not actually argue that the ALJ's treatment of obesity at step three was erroneous, let alone provide legal support to this effect. Without the necessary analysis, I cannot consider this statement as an argument in support of remand.

Garcia next attacks the ALJ's use of "boilerplate" language, stating that he should have "explained how the severe impairment at step two became insignificant at step five." (*Id*. at 8; Doc, 24 at 1.) She then cites generally to *Timmons v. Barnhart*, 118 F. App'x 349 (10th Cir 2004) (unpublished). She does not describe the case, provide a pin cite, or explain the legal holding, so it is unclear how *Timmons* supports her assertion that the ALJ erred. Moreover, Garcia's premise is nonsensical. The ALJ does not consider any impairments at step five; at step five, the ALJ must determine whether the claimant is capable of performing jobs available in the national economy. I have considered the possibility that Garcia is merely being dramatic and trying to imply that her obesity had no impact on the outcome of her claim. Yet, the ALJ expressly considered obesity and its impact on Garcia's other impairments when formulating Garcia's final RFC, and it was based in part on this consideration that he limited her to sedentary work. (AR 19.) To say that obesity was "insignificant" to the outcome of her claim is simply wrong.

Garcia also believes that the ALJ "should have inquired about functional limitations caused by the obesity, particularly with regard to increased pain, her hypertension, and her blood sugar." (Doc. 23 at 8.) She asserts that the ALJ had a duty to further develop the record as to how her obesity impacted these limitations, and his failure to engage in this line of inquiry amounts to reversible error.

In a Social Security disability case, the claimant bears the burden of proving her disability. *Hawkins v. Chater,* 113 F.3d 1162, 1164 (10th Cir. 1997). Since administrative

proceedings are nonadversarial, though, "the ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007). However, an ALJ is under no duty to "exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." *Hawkins*, 113 F.3d at 1168. While there is a duty to investigate even when the claimant is represented by counsel, "the ALJ may reasonably rely on counsel to identify the issue or issues requiring further development." *Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009) (quotations omitted). When the representative is not an attorney, the ALJ may still rely on him or her to present that claimant's relevant medical issues at a hearing. *Steadman v. Apfel*, 1999 U.S. App. LEXIS 2499, *10-11 (10th Cir. Feb. 18, 1999) (unpublished); *see also Taylor v. Astrue*, 2012 U.S. Dist. LEXIS 59651, *9 n. 2 (D. Colo. Apr. 30, 2012) (treating a claimant represented by a non-attorney as represented for the purposes of the ALJ's duty to develop the record).

Garcia relies on *Musgrave v. Sullivan*, 966 F.2d 1371 (10th Cir. 1992), and *Sims v. Apfel*, 530 U.S. 103 (2000), in support of her proposition that the ALJ should have inquired further into the impact of her obesity on her other impairments. While both cases clarify that the ALJ has a duty to investigate, neither hold that that the duty requires extensive probing into all possible ramifications of an impairment when the claimant is represented by counsel. In *Musgrave*, the court held that when a claimant is unrepresented, the ALJ must ask "sufficient questions to ascertain (1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities." 966 F.2d at 1374-75. Unlike in *Musgrave*, Garcia was represented at the hearing. (AR 13.) In fact, Garcia's representative specifically told the ALJ in

his opening remarks that he would develop her testimony with respect to her physical limitations from obesity. (AR 31.) The ALJ may reasonably rely on a representative to present all issues, especially when the representative has expressly told the ALJ that this is his intention.

Garcia's reliance on *Sims* is also misplaced. *Sims* only states the broad rule that hearings are inquisitorial and not adversarial. 530 U.S. at 110-111. The ALJ inquired as to Garcia's obesity (AR 46), and he specifically asked her to describe the medical problems that prevented her from working (AR 36). There is nothing in *Sims* that requires ALJs to ask specific questions about every conceivable or potential limitation and impairment that a claimant might have.

Garcia's suggested areas of inquiry also make little sense in light of the record. Thus, any failure to inquire further would have amounted to harmless error, if it had been an error. Garcia specifically claims that the ALJ should have considered the functional limitations caused by her obesity with regard to her pain, hypertension, and blood sugar. To the extent that Garcia alleged pain, it was with respect to her pelvic issues and her feet. It is unclear how obesity would have any impact whatsoever on cramps that are the result of menses, and there is nothing in the record that could possibly support such a correlation. Furthermore, Garcia and her doctor had identified and implemented an effective method of treatment, and she was obese at the time this issue was resolved. (AR 437-38.)

It is reasonable to assume that obesity could have impacted her foot pain, and the ALJ considered this possibility. (AR 19.) He noted that her foot pain had been largely resolved through treatment; nonetheless, the ALJ still limited her to standing and/or walking for no more than two hours in an eight-hour day. (*Id*.) Such a limitation would accommodate any residual foot pain.

As for Garcia's hypertension, the ALJ had absolutely no reason to inquire into this issue because Garcia's blood pressure had been under control since June 2010 with the use of medications. (AR 361, 368, 370-72, 388.) The mention of blood sugar is a red herring, since Garcia does not suffer from diabetes nor does she suffer from any other glycemic-related illness. The Commissioner raised this in her response (Doc. 23 at 10), but Garcia ignored it on reply (Doc. 24 at 1). Unless Garcia wanted the ALJ to divine future health complications, it was entirely unnecessary for the ALJ to inquire into this matter.

Garcia's argument essentially demands that the ALJ *sua sponte* imagine every permutation and combination of issues that could possibly suggest that Garcia is disabled. The ALJ has no such duty. The ALJ was required to consider how obesity impacted her functioning, which he did. Thus, this is no basis for remand.

## III.  Appropriate Skill Level

The ALJ concluded that Garcia could perform the jobs of mail sorter, jewelry sorter, and charge account clerk. (AR 21.) Garcia correctly notes that these jobs have the reasoning levels of two, two, and three respectively. (Doc. 22 at 9.) Her RFC was limited to jobs that only required her to understand and remember one- or two-step instructions (*see* AR 16), and she argues jobs with reasoning levels of two and three exceed the limits set by her RFC. Garcia concludes that since the ALJ failed to identify the discrepancy between the VE's testimony and her RFC, he also failed to give a reasonable explanation for the discrepancy and therefore committed reversible error. The Commissioner concedes that jobs with a reasoning level of three are inconsistent with her RFC (*see* Doc. 23 at 11), but counters that reasoning level two jobs are not inconsistent with her limitations, so there was no discrepancy to identify. I agree with the Commissioner, and I hold that there was no inconsistency between identifying a job with a

13

reasoning level of two and an RFC that is limited to one and two-step instructions. Since the ALJ identified two jobs with a reasoning level of two, any error in failing to investigate the discrepancy between the RFC and a level three job was harmless.

After the ALJ has determined a claimant's RFC, he "will take administrative notice of reliable job information available from various governmental and other publications[, including the] Dictionary of Occupational Titles." *See* 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). Typically, the VE will testify at the hearing and proffer several occupations that meet the criteria described by the ALJ. The ALJ generally relies on this testimony at step five as substantial evidence to support a determination of nondisability. However, if there is any discrepancy between the limitations articulated in the RFC and the requirements of the jobs provided by the VE, "the ALJ must ask the expert how his or her testimony as to the . . . requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point." *Haddock*, 196 F.3d at 1087.

In the present matter, the VE identified two jobs that have a reasoning level of two, which requires that the worker "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, VOL. II, APP'X C, AT 1011. However, Garcia argues that the ALJ's hypothetical question to the VE would limit her to occupations with a reasoning level of one, which is defined as "[applying] commonsense understanding to carry out simple one- to two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*

Whether a claimant may perform a job with a reasoning level of two when his or her mental RFC is limited to carrying out one- to two-step instructions is not a novel issue. A

number of district courts have considered this matter, and some have found that there is no inconsistency. *See, e.g., Schrader v. Astrue*, 2013 U.S. Dist. LEXIS 40178, *14-16 (N.D. W. Va. Mar. 22, 2013); *Ashford v. Comm'r*, 2013 U.S. Dist. LEXIS 29651, *27-28 (E.D. Tex. Mar. 4, 2013); *Lee v. Astrue*, 2010 U.S. Dist. LEXIS 21998, * 30-31 (E.D. Cal. Feb. 19, 2010). Other district courts have found this to be reversible error. *See, e.g., Wheeler v. Astrue*, 2013 U.S. Dist. LEXIS 26516, * 32 (N.D. Ind. Feb. 26, 2013); *Grigsby v. Astrue*, 2010 U.S. Dist. LEXIS 5465, *7-9 (C.D. Cal. Jan. 22, 2010). To date, no circuit court has expressly resolved this split among the district courts, and I am left to rule on this question without clear precedent.

At the outset, I acknowledge that the reasoning level of one matches Garcia's mental RFC. Garcia highlights this similarity, and she also points to *Segura v. Barnhart*, 148 F. App'x 707 (10th Cir. 2005) (unpublished), as further support for her claim that she only has the capacity for reasoning level one jobs. In *Segura*, the claimant argued that the ALJ lacked sufficient evidence to make a mental RFC determination and that he should have ordered a consultative psychoneurological evaluation. 148 F. App'x at 710. The court concluded that there was sufficient information in the record on which to base a mental RFC assessment, including a consultative examination which limited the claimant to only simple work-related activities. *Id*. at 710-11. The court further explained that "the ALJ accounted for [the claimant's] mental limitations by determining that his reasoning, mathematical, and language development skills were on the most basic rung of the General Educational Development Scale described in the Dictionary of Occupational Titles." *Id*. at 711. The Tenth Circuit's holding in *Segura* in no way requires the ALJ to limit a claimant to level one jobs when he or she has mental limitations. Rather, the court only noted that because the ALJ identified jobs with level one reasoning, he fully accounted for the claimant's mental limitations.

This circuit has found that jobs with a reasoning level of two are compatible with mental RFCs that required only simple and routine work tasks. *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005). In the present matter, though, Garcia was not merely limited to remembering and understanding simple and routine tasks, but remembering and understanding one- to two-step instructions. The core inquiry is whether the holding in *Hackett* will apply to mental RFCs that specifically require that the individual be limited to one- to two-step instructions, a requirement that overlaps neatly with a reasoning level of one.

To answer this question, I consider the source of the reasoning level classification scheme. The term "reasoning level" is not an SSA term; rather, it comes from the DOT, which is a Department of Labor publication.

> The [DOT] uses a different and considerably more extensive classification scheme for skill requirements than the [SSA's] regulations . . . . [A]n ALJ should use information provided by the [DOT] to assess occupational skill requirements, but it is evident that the [DOT's] information about skills must be massaged, if you will, into the [SSA's] three classifications (unskilled, semi-skilled, skilled).

*Haddock*, 196 F.3d at 1089. The language of *Haddock* forces me to step away from the DOT and consider the SSA's classification scheme. While the ALJ may rely on the DOT to some extent, the ALJ's primary duty is to implement the SSA's regulations, not the Department of Labor's definitions. Under the SSA's classifications, both reasoning levels one and two correspond with "unskilled" work. *See* SSR 00-4p (Dec. 4, 2000). Unskilled work requires that the claimant employ "little or no judgment to do simple duties that can be learned on the job in a short period of time." *See* 20 C.F.R. § 404.1568(a), 416.968(a). Garcia's mental RFC fits nicely within the definition of unskilled.

My real inquiry then is whether the VE identified unskilled jobs. Since two of the jobs identified by the VE have a reasoning level of two, which are by the SSA's definition unskilled,

16

there was no inconsistency between the ALJ's mental RFC and the testimony of the VE. While there is admittedly a clear inconsistency with the job of charge account clerk, which has a reasoning level of three, and Garcia's mental RFC, the ALJ's failure to investigate the inconsistency is harmless since there were two other satisfactory jobs. Accordingly, I find that the ALJ did not commit reversible error at step five.

## CONCLUSION

Garcia's three challenges to the ALJ's decision are without merit. Accordingly, I deny her motion to remand and enter judgment in favor of the SSA.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge